It's our last case of the day in re the Marriage of Benecke 4-14-1064 for the appellant we have attorney Helen Ogar for the appellee we have attorney Drew Quitshaw. Ms. Ogar are you ready for this? With regard to this case I realize it's the last one of the day and but it's got two simple issues as we have laid out our argument in my brief we have broken those issues down a bit but generally we are looking at two major items number one is this issue of maintenance in this case and the second is the issue of how the court handled a condominium located at Lake the Ozark Missouri so I'm going to handle first of all the issue of the maintenance because I think that might be the more difficult one for the court I think the issue of the condominium may be a little more straightforward and although I think the court kind of confused it I think it's a very it's a little easier to for this court to to rule on in that issue and find that the court erred but the maintenance argument is very difficult and I want to start with a little bit of facts and I know you've read the briefs I know that you know some of this but I just want to briefly review some of that and that is the parties were married in 1991 they were divorced in 2012 so they had a 21 year marriage there is no dispute that throughout that marriage my client was the primary breadwinner up until just as the marriage was dissolving there's no Mr. Benneke was a stay-at-home mom for 16 years all of that is true however at the time of the divorce in June of 2012 Mr. Benneke was unemployed and Ms. Benneke had become employed full-time as a marketing specialist at mark excuse me mortgage services and so they were in quite a different situation than they had been during the marriage and I know that how they got there is a primary issue in this case and so how they got there really was my client had been employed at Olympus and he was a salaried employee boy he was working in a specific area of Olympus with medical equipment there was a tsunami that tsunami knocked out everything he was selling and basically was the end of his department now he could have quit then he could have gone on unemployment he completely new area that he was unfamiliar with with regard to that new area that he was unfamiliar with he was trying to learn the ropes and all of this was occurring at the exact same time that his marriage was undergoing a breakdown he had a son who was injured in an accident and quite frankly he had some difficulties adjusting to those things the marriage breakdown was very difficult he took some personal time off which is reflected in petitioners exhibit seven and then he came back and was trying to do this new job additionally and there's no question about this he's an alcoholic he is an alcoholic who also suffers from depression the testimony was that he had been in rehab three times from the date of the divorce until the date of the final hearing at the date of the final hearing is the rehab that he had taken had taken he's been clean and sober great for him but there was a period of time where he's truly struggled with both the alcoholism and the depression in terms of where he was in his life and with regard to that he did lose his job at Olympus he was fired and counsel has marked and attached to his brief a little memorandum that talks about that being terminated but if you read between the lines of that on the latter part it talks about him adjusting from one portion of Olympus to another and the adjustment that he's making there's no dispute with his alcoholism with his depression with him trying to learn a new job he didn't do a very good job and he did get fired that is that's out there the problem is then how the trial court took that information and what the trial court did with it at the time of the hearing my client was unemployed granted and counsel has talked about the fact that he made over $200,000 one year that another year he made $150,000 but basically starting in 2011 and moving forward his income had been significantly reduced and counsel in his brief lines out the income up through 2011 but in 2012 that income dropped to $47,275 in 2013 his income was $19,000 and his testimony in 2014 when he finally obtained a job and had that job his job was $30,000 a year now we did file a motion to reconsider that motion was denied there were some surprises with regard to that we had thought the court was going to give us an opportunity to argue that we received the court's opinion literally the day we were going in for a hearing the day we went in for the hearing there was additional testimony about some debts and those were distributed there is no appeal on the debt we have no issue with regard to that but I want this court to look at what where we were the day that the court made its decision Mr. Benneke at the time was unemployed but then he had a family farm he was a farm manager with regard to that he was provided with a condominium in which to live so he had some rent paid as well so that job was pretty good under the circumstances in terms of his earnings and having a place to live and having some stability and foundation underneath of him however Mrs. Benneke was making $37,000 a year the court then indicated well I'm going to set maintenance at $2,000 and the court referenced the fact that my client in his testimony said look I think I'm going to make somewhere between $50,000 and $100,000 and I submit to you that that was my client's testimony but he's a salesman and he's Mr. Optimistic the reality of it is is he never did and he still hasn't and we sit here in a situation where he's ordered to pay essentially 80% of his income 80% of his gross income towards the maintenance and really has no way to recover and so what we're doing here is really hoping to give him some hope and with regard to this the court had other options the court could have said set maintenance reserved maintenance completely the court could have set maintenance at a much much lower figure and then ordered him to find employment to report as he often as a court would often do with a child support case what are you doing to look for employment but the court and I'll submit if you look that we hearing but we do have a transcript of that motion to reconsider a portion of that hearing and with regard to that I think even just the tenor of the court's comments towards my client at that time can be observed and with regard to that the court indicated that his alcoholism was self and where he was I wrote it down self-inflicted his situation was self-inflicted that he was standing in the shadow of jail and so with regard to that and it's set forth in my argument but number one with regard to this maintenance the maintenance is just really excessive under the circumstances my client has no way to get out from underneath of it my client has no ability to really pay it and meet any of his own needs compare that to his wife granted we have no dispute that had he been working at Olympus making $100,000 he would have happily paid the maintenance ordered by the court but he wasn't she was in a situation where she was paying into a 401k she had benefits including insurance and was able to pay off some debt between the time of the original hearing and the hearing at the final motion to reconsider which the court allowed argument on some debt and she indicated that in that time frame from March to November she had paid off an $1,800 credit card debt so what we have here is that my client who has essentially been unemployed since June of 2012 he finds some employment which is what the court ordered him to do find some employment or face jail time so he did but that situation is not the situation where he's making the hundred thousand dollars or more that this court has ascribed to him and in fact I did the math under the new maintenance statute and if you assume Christina was making thirty seven thousand if you combine income that would require Mr. Beneke to make a hundred and fifteen thousand dollars a year and that just doesn't seem it is not reasonable it is not a situation where he can make that and so every single day that passes he gets further and further and further behind with no hope of ever getting out of debt that was then exacerbated by the fact that the then the court when we take new evidence with regard to debt again I thought it was motion reconsider but the court ruled on that the court then also ruled on a contempt petition at that time and ordered Mr. Beneke to pay sixteen thousand dollars in a very short time frame and in fact I do the math in my brief and say I believe he has to come up with like three hundred fifty five dollars and some odd cents every single day from the time the court made its ruling for the time the bill was to be paid for him to make that payment and there was just no capacity to do that so the reality of it here is that what we're asking for is some relief so that he has some hope do we say he never has to pay any maintenance no would we be acceptable to him to have some sort of relief that says you have to look for employment or pay five hundred dollars a month maintenance that would all be fine I didn't cite it in my brief but it's very similar there's a third district case involving child support called Fink we use it in child support cases and in that case the father went on strike and the court suspended it but said as soon as you come back you're going to owe this back child support you don't you won't be in contempt you won't be so there are options that the court could have taken regarding this but simply order him to pay 80% of his income in order to meet these requirements of the court simply put him in a situation where there is no hope and there is no way to get out and then coming in and saying you have to pay $16,000 in this very short time frame certainly put him in a situation where he was unable to meet those expenses the court found him in contempt specifically threatened him with jail if we came back in January in the meantime we took this appeal. Was there testimony? How was it that the court came to that dollar amount in that time frame? There is testimony there's a brief it's in the transcript from the November but it was on the rule to show cause and the court distorted the $16,000 paid but the $16,000 would represent the eight months from March until November where the $2,000 a month payment was to have been made and my client was also not receiving any unemployment during that time but then became employed towards the end of that and that's where the $2,500 per month came from was he was employed in late fall of 2014 with regard to that. So the $16,000 represents what my client did not pay from March until November of 2014 when he was unemployed and for most of that time underemployed for a very short period of that time and receiving no unemployment benefits because his unemployment benefits had run out the prior year. Wasn't there some testimony that just rang her regarding basically a threat by your client saying he would never work again if he had to pay her maintenance? There is that threat that is in the bystanders report there was some dispute as to whether or not that was what was said but that is what the trial judge certified as what was said. With regard to that I don't recall the testimony directly but my only understanding of it is during that time frame my client was depressed, he was an alcoholic, he was dealing with a lot of issues. His testimony and that's what's interesting, his testimony and it is in the bystanders report in like paragraph 33 and a prior paragraph is everything he did to try to find or making sure that he was online and in fact that there was a dispute later on about whether or not he should have had any sort of internet connection as he testified I can't look for a job without the internet I've got to have the internet that's how these people look for jobs at this. Is he hopeful even as we sit here finding a better job? He is but he's got to get out from underneath of this so that he can function and have some income where he can meet his needs. With regard to that testimony of I'll never work again and I'm here to screw you, I'm sorry but that's essentially what he said or that's what's in the bystanders report. Again I think he was in a period of depression and an alcoholic at that, he's still an alcoholic but a recovering alcoholic. So with regard to that but he had significant testimony about the fact that I switched jobs at Olympus so that I could maintain my employment. I kept looking for employment. There was the situation with the tsunami. All of that testimony was then interpreted by Judge Reiner to simply be where he was responding to that the fact that Christine Venike testified to that and he was responding to that. Judge Reiner then came in and said well you're just making excuses. You're making excuses when in fact he was trying to show look I hung in there, I did the best I could under some very trying circumstances with regard to these numerous issues. I do believe alcoholism and depression are real diseases. There is no dispute that he did suffer from these issues. That has never been called into question but I think the courts dismissal of those as being self-inflicted and my client choosing to disable himself doesn't give really rise or gives this court an idea of where the trial court was and that's part of our argument too in our brief is that he was really punishing him for some of these things when in fact I don't think the imputation of income was appropriate. I do think the trial judge did kind of seek to punish him for some of this behavior. It seemed to me like the other thing that hurt your client was that he was finding ways to pay other bills but he couldn't pay anything on his maintenance. Well he was unemployed and in terms of paying other bills he was basically borrowing from his father to pay those bills. There is testimony in the bystanders report that I believe he owed $43,000 to his father. In his financial affairs affidavit which was then submitted in November that debt had gone to $105,000. So there were a significant amount of him borrowing from Peter to pay everybody else and with regard to that no there hadn't been any payments in that eight month period. That is true. Did Michael provide the evidence that the court then used to impute the $100,000 per year in income? I don't know that he testified that he believed he was going to make somewhere between $50,000 and $100,000. That was his testimony that the court then said well I'm going to use the upper end of this and in fact went to I think my math is correct $115,000. But yeah he did testify to that. Did he put it in, I'm going to ask, did he put that in some sort of context that if this happens then I might be able to earn $50,000 to $100,000? He's basically saying I want to get a salesman job. I am looking for a salesman's job and that was in the context of what he had been doing to try to find that employment about hiring a headhunter, getting his resume up, talking to people, networking, going online, doing these various attempts to find this employment. And I would submit, Your Honors, that part of this is, and the imputation argument is always like this, how far is someone going to go to slice off their nose to spite their face? And the reality of it is if he could make that $115,000, if he could make the amount of money that's been imputed to him, the $2,000 would not be a problem. The problem is he's not making it, nor do I think that that is likely anytime soon. And I think that there are other very just ways that are very, very fair to Christine Beneke that this court could have chosen in terms of saying you can abate this for a period of time, you can lower the amount of maintenance and order him to find employment, report back to the court on a regular basis as to those attempts. But basically he is in a sales, all he knows how to do really is sell things. And in a salesman's job when you're then starting out at the beginning, you're starting out where you're covering a territory. And so even when he does that we've got a little bit of a problem. I just want to cover the Ozark condo very quickly. It is covered in my brief. However, the Ozark condo, I never understood exactly what the rationale behind the court was. Christine Beneke said it was a gift. If it was a gift, that's easy. Because the title to it was in only my client's name and his brother's name. So if it was intended to be a gift, nobody put her name on it. So that's easy. She thought it was a gift to both of them, right? Well, she thought it was a gift, but that doesn't matter because the law is pretty much controlled by how that is deeded. Plus, father, who is the one who was supposedly having the donative intent, indicated there was no donative intent specifically with regard to her. So if you follow that rationale, and the judge says, look, we've got some conflicting testimony. And the judge rejected that, said, I don't think it's a gift. I think it was purchased. But nobody ever paid for it because that debt's going to be forgiven at some point. Well, again, I don't think that the elder Mr. Beneke testified he'd forgive that debt. I think he testified, look, I'm never going to get paid on all this money I've lent my son. It's very unlikely that I'm ever going to get any sort of payment back. But the reality of it is then if you follow the court's rationale, which is it was purchased during the marriage and therefore marital, then there had to be some money changing hands. And no money changed hands. There was testimony galore. We have exhibits seven through seven showing that every payment was made by the elder Mr. Beneke for everything, for taxes, for insurance, for boat slips. All of that was paid by him. So there was no marital monies put into this at all. And the judge says, well, now he's going to forgive this debt. Well, then that is a gift. And moreover, in the judge's order, he says this is the sort of thing that the elder Mr. Beneke can simply take care of in his will, which again has my client having his estate. So what the court is suggesting is that Mr. Beneke can take care of it in terms of his estate planning because one brother did pay, my client did not. So what about Ms. Beneke's testimony that they did some renovations? I know it wasn't very specific testimony, but I do recall that she testified they did some work on it. Right. In that, and I have a case in my brief that talks about, look, that doesn't mean that it becomes marital property, number one. Number two, I believe she completely failed in her proof at all. There's no document showing so much as one receipt for a area rub purchase for the place. There's nothing indicating in terms of what was done, what the improvement was to the property. Whose burden is it to prove that it's not marital property? The burden to prove if it is non-marital property, which is what she was basically saying it was a gift, the burden to prove that there was a marital contribution would fall on her. That wasn't my question. Yes ma'am, I'm sorry. Whose burden would it be to prove that it's not marital property? That would be on the person alleging it to be non-marital property, which I believe having a deed showing she was never on it certainly goes to that. I mean, I think that ends it. I mean, I don't think you can say, I can hope for a long time that I own the real estate underneath this building. I can hope, and I can like, and I can think that that's what happened, but it doesn't matter because what matters is what is filed in the recorder of deeds office, and that is what controls who actually owns the property. We'll have more time on rebuttal. Yes ma'am. Sorry. Sorry. Mr. Kitchoff? May it please the court, counsel. My brief primarily stands for itself and speaks for itself, so I don't have a whole lot to add to that, but I will briefly touch on the six points that counsel brings up in her brief. The six points, starting with the first is whether or not the trial court erred in awarding the maintenance to be paid, and as the appellate court is aware, the amount of maintenance is within the sound discretion of the trial court, and the appellate court must not reverse that discretion unless it was an abuse of discretion. And the factors that the trial court looked at in deciding whether or not to award maintenance was number one, that Ms. Meneke was in fact a stay-at-home mother for 16 years during the course of the marriage. Number two, that the parties were married for 25 years, that Michael had been the breadwinner during the marriage and had earned on average $225,000 per year for the five years prior to the divorce. The court also found that Christina's reasonable needs were about $2,000 per month, and I think that's primarily where the maintenance amount comes from. The court also found that the parties had enjoyed a high standard of living during the marriage, and the trial court found that it was proper to impute income to Michael based upon his bad faith termination from employment. It's hard to look at point one, whether maintenance is appropriate, without looking at point two, the imputation. But just touching briefly on the imputation, that was based in large part upon Michael's statements to Christina that are in the certified bystander's report that he was purposely going to get fired so he wouldn't have to pay maintenance. His statement that he was never going to work again. In addition to that, the fact that he had been as the entry of the bifurcated judgment, which the court did not find to be a coincidence, that Michael had gone two years following his termination without obtaining any employment. In fact, he hadn't offered any evidence whatsoever as far as what efforts he had made from the date of his termination up until the time that we came on to hearing on all remaining issues as far as what he had done. So for the most part, at least the record would reflect that he hadn't done much of anything during those two years to attempt to find employment. The court specifically found that Michael was the poster child for bad faith and also in imputing that income relied upon statements by Michael that he could go out and obtain employment almost immediately at a rate of $50,000 to $1,000 per year and also that Christina had earned $37,000 to $40,000 per year and had not ever earned anything more than that during the course of the marriage. I think the court also gave a little bit of weight to the fact that Christina was also providing medical insurance for one of the party's children and vehicle insurance for both of the children. So based primarily on those facts, the trial court properly found that maintenance was appropriate. The second point was did the court err in imputing the income and both parties pointed out in their briefs that there are three factors that the court is supposed to look at in making that determination. Number one, and only one of them has to be satisfied in order for imputation to be appropriate, number one was the payer voluntarily unemployed and again based upon the statements of Mr. Beneke and based upon the information in his Olympus personnel records, the court found that he was voluntarily unemployed. I don't think that the record or the evidence supported this argument that his termination was as a result of the tsunami and for the most part the trial court did not find that to be a credible excuse for his termination. That Olympus termination report included multiple complaints for Mr. Beneke's lack of timely factor was the payer attempting to evade the support obligation, again based on the statements, the termination from employment the same month and the fact that he had done nothing for two years following the termination from employment. I think the court took that into consideration in finding that that factor was applicable. And number three, did the payer unreasonably fail to take advantage of employment opportunities? There wasn't specific evidence on that topic, but again I think based upon the fact that he hadn't introduced any evidence or showed the trial court any attempts to find employment during that two years, the trial court assumed that he had not made reasonable attempts to find employment. So the imputation of the income, the trial court did not err in doing that. The court did not touch on specifically this afternoon, but the point in the brief was that the trial court improperly considered marital misconduct. I don't think that that's supported by the evidence or the record. I think the court's finding that he engaged in bad faith and imputing income is certainly different than improperly considering marital misconduct. And in making that finding, the trial court did note that Michael's testimony, including his demeanor on the stand, was less than credible. The fourth point that the appellant brings up in the brief is that the court erred in finding Michael in contempt. And just so there's no confusion, the order entered on May 1st, 2014 required Michael to pay $2,000 per month in maintenance. And when the case actually came on for hearing on the contempt petition in November of 2014, about six months later, Mr. Benneke had not paid anything. He had not made any attempt whatsoever. He hadn't paid $1 towards the support obligation. In addition to that, he had admitted that funds had been spent on other things, such as vacations, gifts, entertainment, and also testified that he did have income at that point in time and that he had minimal living expenses based upon the fact that he was living on a property primarily owned, I think, by his father. So due to the fact that he had paid nothing during that six-month period of time, the burden was on Michael to prove that his failure to pay was not willful or a contumacious, and the court properly found that he failed to meet that burden. The fifth point was whether or not the court abused its discretion in requiring Michael to reimburse Christina for the condominium. I think that Ms. Ogar correctly pointed out this afternoon that Christina testified that she thought it was a gift to both her and Michael. The trial court did not ultimately end up finding that that was the fact. Instead, what the trial court found was that it was marital property because it was accumulated during the marriage, but that there was no debt associated with it. And that was based upon both Michael's testimony and his father Ed Benneke's testimony that it essentially had initially been a sale or a transaction where the initial agreement was that money was going to be paid for the condominium. But then, as time went by, both Michael and Ed, the father, admitted that it was never going to be repaid. Both of their testimony was congruent in the fact that there would be no repayment of this debt. So marital because it was accumulated during the marriage through a transaction, a sale, but then the court properly found there's no indebtedness on it because neither the lender or the lendee expected repayment, and there was not going to be repayment. So that's how we got from, you know, whether it's a gift or whether or not it was a sale, you know, how do we get to the fact that it's marital property but there's nothing owed on it? That's how, and I think that was the proper finding. It was not initially a gift. It was a transaction, a sale, but when we came to the time that we were divorcing the parties, nothing was owed on that property and nothing would be paid on that property. The final point that the appellant raises in the brief is, was the valuation proper of $35,000? I agree and I admit that Christina testified that she had thought maybe it was worth $25,000. However, that testimony wasn't based off of any kind of expert knowledge. I think the court took the most credible and most competent testimony and evidence on that topic, and that being the testimony that the brother, Jack, had paid $35,000 for his one half. So the testimony, I think it was of Ed Benneke, was that Jack paid $35,000 for his half, and so then that is obviously the most competent testimony and evidence on the topic of what was the other half worth. And that's where the $35,000 came from, and again, I don't think that that was an error. I've added some case law in my argument as to Mr. Benneke certainly had opportunities to bring to the trial some evidence on valuation and opted not to. There could have been obviously an appraisal, valuation, etc., and none of that evidence was presented to the court. So we would ask that the court affirm the findings of the trial court. Thank you, Mr. Pichai. Ms. Ogar, do you have any rebuttals? With regard to the condominium, my client's testimony is that he didn't know when he could repay, and if you look at the bystander's report, there's actually nothing in it. But my recollection is that he wasn't sure when he could. That was the testimony in March. When he came back in November, he testified that they were going to sell the condo and the proceeds were going to be paid to his father to repay him because the debt had never been paid. The issue is that if the father was going to forgive the debt, which is what Judge Reiner found, then that in and of itself is a gift. And the father testified. I had no donative intent to include Christine. I didn't put her name on it. Her name was never put on it. It was put into both of my son's names. My other daughter-in-law wasn't on it either. And so the issue really becomes if, in fact, that forgiveness of a debt, which by the way, what Mr. Edward Beneke testified to is that he didn't know how his son was going to repay him. And my client testified, I don't know how I'm ever going to repay him. But the bottom line of if that debt is forgiven, then that in and of itself is a non-marital gift to my client. And then when the court goes on in its ruling to say, well, he can take care of this when he takes care of his estate planning because it's unfair that one son had paid and Michael had not paid, it just further strengthens that argument that this was a gift only to Michael. If, in fact, there was going to be loaned forgiveness, that would have been a debt. And the father testified again. The person with the donative intent came and testified there was no donative intent. And not to take you back to the first week of law school, but to have a gift, you have to have that donative intent and delivery. In this case, we had neither because the delivery would have to be a deed in Christine's name. And that was never done. Her going down there and enjoying it doesn't make it marital property and doesn't make it a gift to her. With regard, just very briefly, and again, that testimony in November was that the condo was to be sold and the father paid from the proceeds. Counsel says you cannot reverse unless there's an abuse of discretion. I respectfully submit that 80% of your payment for maintenance and where one party ends up with 91% of the total combined income and the other party ends up with 9% of the total combined income probably borders on abuse of discretion. The bifurcated judgment issue where he said he lost his job the exact same month that the bifurcated judgment was entered doesn't really make any sense because, of course, in his brief he attaches some documentation back in April where they're talking to him about this issue. However, the loss of employment the same week, bifurcated judgment was agreed to. My client didn't think it was that big of a deal. He agreed to bifurcate the judgment. This court is aware you can only bifurcate upon a finding of appropriate circumstances or agreement. My client said, sure, let's go ahead and get the divorce. He also indicates that my client put on no testimony about what he was doing. In the bystanders report, paragraphs 23 and 21 stay employed and number 2 become reemployed. So with regard to that, there's no evidence he turned down any jobs. With regard to that, there was some testimony about, oh, he got to take vacations and give gifts. That vacation, if you'll look at the transcript, his son had returned from Afghanistan. He spent approximately $650 to visit his son on the East Coast so that he could see his son when he returned from Afghanistan. He did say that. However, it wasn't like he was living the life of Riley. He did have restricted. He talked about the fact he's driving a 2005 vehicle. He had dental work he couldn't get done. He couldn't have health insurance. The health insurance that he purchased had such a high deductible that it was essentially just for emergencies. So basically, that in his position, living in a situation, basically in his father's condominium and working as a farm manager versus someone who's making more money, has benefits, has a 401k that she continues to pay into, does point to the idea that the maintenance issue may have been improperly decided by the trial court. So, thank you. Thank you, counsel. We'll take this matter under advisement and stand